## John Bolton, et. al. vs. Robert Flournoy.

### Bill for relief and Injunction.

The references of a bill in chancery are a part thereof. Where a bill in chancery, seeking an injunction, refers to another bill pending in same Court, in *pari materia*, and intimately connected with it, the Court may invoke the allegations of the latter bill and the answer thereto, in deciding upon the prayer of the former.

The powers of the " *Superior Courts*" of Georgia, as Courts of equity, are co-extensive with those of a Court of chancery in England.

Is a Jury required by law in a chancery case in Georgia.—*Quære*.

The Judge of the Superior Court acting as Chancellor, has the power to appoint a master in chancery, *pro hac vice.*

And where the title is in dispute, and facts are necessary to be ascertained to determine such dispute, it will be referred to such master to examine and report thereon.

### By CHARLTON, Judge.

THIS is a bill for an injunction, and it prays also for general relief.

I shall only give the allegations, as far as they are necessary for the purpose of this opinion. It is stated, that the complainants to this bill, are *John Bolton, Curtis Bolton, Richard Richardson*, and *Durham T. Hall*, trading under the firm of *R. Richardson & Co.*: that this co-partnership, a commercial house of this city, borrowed of the defendant, on the 27th of March, 1818, the sum of $15,879 79, of Mississippi stock, and gave an acknowledgment of this loan, promising to return it on demand, after thirty days notice, or to pay interest for it, at the expiration of the demand: that one of this firm, the complainant, *John Bolton*, was the proprietor of lots Nos. 1, 2 and 3, in 3d Tything, Anson Ward, in this city, with the buildings and improvements thereon: that *Richard Richardson*, (another of the complainants,) as agent of the complainant, *John Bolton*, (and it is added with

his approbation,) in November, 1819, *entered into a contract* with the defendant, *Robert Flournoy*, for the sale of the lots and buildings, and the said defendant agreed to purchase, for the price of seventeen thousand dollars—the loan of Mississippi stock to be taken as part payment, and the residue to be made up from proceeds of the sale of cotton, shipped to Liverpool, on account of defendant, by complainants, and other funds in the hands of complainants, belonging to defendant : that the complainant, *R. Richardson*, after entering into this contract, communicated what he had done to his partner, (and one of these complainants,) *John Bolton*, who then resided at·New York : that *John Bolton* executed titles, in which his wife joined, and returned them to the complainant, *R. Richardson*, for the purpose of having them delivered to the defendant : that under the impression that the contract would be complied with by defendant, the complainants, *as a firm*, considered the Mississippi stock, as the individual property of the complainant, *John Bolton :* that on the re-transmission of the titles from New York, executed by the complainant, *John Bolton* and wife, the defendant, *Robert Flournoy*, refused to accept them : that the defendant has sued the complainants, and recovered judgment against them, for the amount of Mississippi stock and proceeds of Cotton, which sums united, are not sufficient to pay for the property purchased : that *John Bolton* hath also filed a bill against defendant, praying a specific performance of the contract and agreement entered into with the complainant, *Richard Richardson :* and that the complainants have applied to, and requested defendant to suspend proceedings on his judgment, until the final decision of the bill of *John Bolton, now pending*, for a specific performance, upon which decision depends, (as is alleged,) the benefits of defendant's judgment.

Upon these statements, the bill prays for an *injunction* to restrain further proceedings upon the verdict and judgment of defendant ; and rests its application upon the interrogations :

whether the complainant, *John Bolton*, hath not filed his bill for a specific performance of the complainant *Richardson's* contract? and whether that bill is not now pending?

Without further reference to this contest, what are the inquiries that now necessarily present themselves? I presume they are these :—is a bill thus alleged to have been filed by one of the complainants for specific performance, pending in this Court? and is it true, that it is so intimately connected with this prayer for an injunction, that without its invocation, there would be no basis for this application, for an injunction? This bill declares, that such bill for specific performance *is pending*; and that a decision upon it, and upon it *alone*, will depend the justice and equity of the defendant, to avail himself of the verdict and judgment at law. The fact is, that such bill for specific performance *is pending*, and the other inquiry as to the intimate, inseparable connexion between it, and this bill for injunction, is now to be considered and answered. I answer this inquiry then, by plainly saying, that I know not by what possible means, I can find access to the doctrines which are to direct me to the equity claimed by complainants, without asking information from one of them. The firm of *Richardson & Co.*, is composed of the complainants of this bill. Who are they? *John Bolton, Curtis Bolton, Richard Richardson*, and *Durham T. Hall*. A judgment is obtained against this house, upon a loan and debt for which *all* are liable. But, this liability assumes a new, and different aspect in chancery—it is thrown upon the shoulders of one of the co-partnership, because, the defendant in this proceeding, has contracted and agreed to take the separate property of *John Bolton*, one of the firm, in payment of the debt due by the firm. This agreement was anterior to the judgment. The defendant's conduct was, therefore, in violation of good faith, in prosecuting his claim to verdict, and we, *the firm*, are entitled to injunction, until *he* complies with the terms of his agreement with our Mr. *John Bol-*

*ton*, through our **Mr. R. Richardson.** This is substantially the argument of the bill, filed by *Richardson & Co.*—and it consequently admits, that without reference to the bill of injunction of *Bolton*, for specific performance, there can be no foundation for this bill of complainants. Authorities are cited to shew, that you cannot travel *dehors* the allegations of the bill, and denials of the answer in granting injunction ; and therefore, this bill, notwithstanding its reference to the bill of *John Bolton*, for specific performance, is to stand, or fall, by its own isolated assertions. No case goes to this extent, nor could it, because, the references of a bill are parts of the bill, and are among *its* vital principles. In this case, unless the bill of *R. Richardson & Co.*, for injunction, and general relief, and the bill of *John Bolton*, the co-partner, are considered in *pari materia*, or explanatory of, and auxiliary, each to the other, the bill of *R. Richardson & Co.*, is an *ignis fatuus* leading and bewildering us, we know not where, until the beacon of *John Bolton's* bill appears, and directs us to the port of destination. There can be no injunction, unless *John Bolton, prima facie* is entitled to specific performance. This was the reason for granting the *rule nisi*, and this, upon the whole, must be the reason for rendering it absolute. This bill has no other expectation of the relief solicited, than an association of the allegations of the two bills ; and so considering it, I must necessarily look to the very object upon which it primarily relies—and solely relies, for the refusal of the motion submitted, for a dissolution of the injunction—and that object is, the bill for specific performance. This bill of the partner, *John Bolton*, for specific performance, alleges, (among other matters, not material now to advert to,)— that *Richard Richardson*, in behalf of this complainant, entered into a contract with the defendant, *Robert Flournoy*, for the sale of the lots and improvements, as mentioned in the bill of *R. Richardson & Co.* : that this complainant approved the contract—signified his approbation by letter—and in the same communication, expressed his readiness to execute titles, whenever they should

be prepared, and forwarded to him.    The complainant admits the previous loan of Mississippi stock, upon the liability of the *whole firm*, as stated in the bill of *R. Richardson & Co.*, but that it subsequently became his individual property—by the agreement to transfer *his* town lots and improvements, in discharge and payment of the loan of Mississippi stock to the firm—for the value of which stock, he became a creditor to the firm, and that, after *entering into the contract* (as set forth in the bill of *R. Richardson & Co.*) the defendant, *R. Flournoy*, " in pursuance thereof, took possession of said lots, and the appurtenances." Confined as I am, as it will soon appear, to a limited discussion of this case, I deem it unnecessary, to notice any further charges or allegations of this bill.

The connexion between the two bills will now be more clearly perceived, and consequently, the impossibility, of considering *alone* the bill of *Richard Richardson & Co.* for the purposes that bill has in view. The bill of *R. Richardson & Co.* prays for an injunction, upon the ground, that the defendant has been paid the debt for which he has obtained a verdict, and now seeks to make the firm liable ; and it refers to the bill of the co-partner, *John Bolton*, to shew, how that debt has been extinguished, and adds, that any hope, which the defendant can have, of obtaining the benefits of his recovery at law, essentially, and entirely depends upon the final decree of this Court on *John Bolton's* bill for specific performance. We are therefore, as before stated, compelled to invoke the allegations of this bill for specific performance, in deciding upon the charges of the bill of *R. Richardson & Co.*— and if the allegations of the bill of *R. Richardson & Co.*, force upon us this necessity, there is no abandonment surely, of the fundamental principle of chancery practice, that in granting injunction, we must keep within the allegations of the bill praying for injunction. Having settled this point—our attention is now called to the answers of defendant. To the bill of *R. Richardson*

PART I.—R.

*& Co.* he answers, that *R. Richardson & Co.* some time in July, 1819, borrowed the sum mentioned in their bill, in Mississippi stock, upon the terms also mentioned in that bill: that *R. Richardson & Co.* were further indebted to defendant, on an unsettled account for cotton sold; that to recover the whole, defendant instituted a suit and has obtained a verdict: that in November, 1819, defendant had a *conversation* with *Richard Richardson*, concerning the purchase of lots Nos. 1, 2 and 3, in Anson Ward, in the city of Savannah, with the improvements thereon, and *six feet of ground*, to be taken from the lot occupied by Mr. *Alex. Irvine*: that this defendant consented to discount $17,000 due him by *R. Richardson & Co.* for this property, (represented to be the property of *John Bolton*,) and the defendant, expecting to get good, legal, indisputable titles for the same, in fee simple: that at the *instance* of *R. Richardson*, the defendant occupied a part of the premises: that discovering from an examination of the will of *John Bolton*, (which he makes an exhibit to this answer,) that *John Bolton* had only a life estate in the property, he, the defendant, declined entering into any *written agreement*, with *R. Richardson*, for the property thus intended to be purchased, and would have refused any title from *John Bolton, if it had been tendered*— but that *no such title* has been *tendered* to defendant or, (as informed) to his attorney. That he admits a bill has been filed by *John Bolton*, for a specific performance of the alleged contract, entered into between the defendant and *R. Richardson;* that he has filed his answer to that bill, and was anxious during the May Term of this Court, to have had a decree on the merits of the bill and answer; but, that complainant did not proceed, and refers to this bill and answer to shew, the *futility* of any expectation of specific performance. The answer to the bill for specific performance, is with few additions, *mutatis mutandis* a transcript of the other. It urges, that the occupation of the premises, and the very ground work of any arrangement with *R. Richardson*, was under this impression—indeed the conviction—that indis-

putable titles could be given ;—and that the defendant had no idea of any difficulty whatever, with regard to the titles, " otherwise, the defendant would have had nothing to do.with the property." He admits the judgment at law.   Upon these pleadings the complainants *R. Richardson & Co.*, have been required to shew cause, why the injunction should not be dissolved.

It was contended by the solicitors for defendant, that it was competent for them in shewing cause why this injunction should be dissolved, to range through the whole ground of equity, occupied by these bills and answers.   Under this impression, the case was argued by Mr. *Bulloch,* and as the basis of his argument, he assumed three positions.   1. There is no contract exhibited, or evidence of contract furnished by bill and answer.   2. If there were evidence of contract, it would be unavailing, because the complainant *John Bolton,* has not a clear indisputable fee simple title to the property, which is attempted to be transferred in his behalf, by such contract.   3. Equity will not enforce the completion of an agreement, if there be substantial doubt as to the goodness of the title of vendor.   The assumption of these grounds and propositions threw the whole case upon the Court, and imposed upon it the necessity of deciding upon the effect of the agreement, in relation to the Statute of Frauds and Perjuries, the perplexed and variant adjudications as to part performance—and when all these points shall have been disposed of—the still more involved and intricate question, as to defectiveness of titles.   The further advances of the argument of the defendant's counsel *in extenso,* was arrested by Mr. *Harris* (one of solicitors of complainants,) by a suggestion, which he attempted to illustrate and establish by authorities, that the main, and principal inquiry as to validity of title, can only present itself to the consideration of a Chancellor, upon the report of a master, after reference to him, in the usual practice of a Court of equity : and that if such reference and report were not sanctioned by the usages and practice

of the equity side of *this Court*, still the discussion *in extenso*, would lead to a judicial usurpation, upon the rights of a special Jury,—because, the discussion upon *all* the equity of the bill and answers, would involve the whole *merits* of the case, and would therefore demand a final decree, but which decree according to the judicial system of Georgia, requires the aid and co-operation of a special Jury. He contended, (and it was afterwards enforced by *Davies & Berricn*,) that if the validity or defectiveness of title were to influence the Court, even in the opinion it might express, or the order it might give on *this motion*, still, whether that title was valid, or defective, could not be conclusively ascertained by the bills, the answers, or the exhibits, because, the condition and capacities of the parties, might be very variant and different *now*, (as that condition and these capacities, operated upon the tenures and interests created by *Robert Bolton's* will) from what they once appeared, or, might appear at the plenary hearing; and that whatever might have been the defectiveness of title, at the epocha of the agreement, or at any other time during the occupancy of the property, or a part of it, by *R. Flournoy*—it was sufficient, for all the purposes of equity, contained in the bill for specific performance, to tender a good title *at* the period of the decree. Mr. *Harris*, asks, (in support of his suggestion, that the practice in chancery required a reference to a master,) "is there evidence in the bill, or answer, that the title is good, bad or doubtful?" The defendant attaches to his answer, a will of *Robert Bolton*, which he charges, gives only a life estate to *John Bolton*, in right of the interest vested in his wife, the devisee—for, this is an executory devise, it is a fee limited on a fee, and upon the extinction of heirs of *Sally Bolton*, the fee simple interest vests in the heirs of another daughter.

How is this Court to ascertain from the bill and answer, the facts necessary for the ascertainment of the interest *John Bolton* has in the property, even under the construction given to the

will, by defendant's answer? Can this Court know judicially, that *John Bolton*, his wife or children are living—and that the other daughter of *Robert Bolton* is living, having children, in whom this expectancy may ultimately vest? These facts, are not disclosed in the pleadings. If the Court therefore has no judicial notice of the facts—and particularly of the persons *in esse* for whose benefit the limitations in the will of *Robert Bolton* are intended, *a fortiori*, the Court can have no personal knowledge of these facts. It is a matter therefore of investigation and evidence, beyond the allegations of the bills, and the charges and exhibits of the answer, and if thus dependent upon ulterior investigation, for the purpose of settling, and ascertaining extrinsic facts and circumstances—the expediency, the propriety, and necessity, of a reference to a master, or other officer, must be strikingly obvious ;"—and numerous authorities, are cited to shew, that a Chancellor of England would consider and order a reference, as a matter of course.

I think, this is a fair representation of Mr. *Harris'* argument, on his motion or suggestion for a reference to a master in chancery.

*Law* and *Jackson*, associated with Mr. *Bulloch*, as solicitors for defendant, repel this motion for a reference, by contending, that the appointment of a master in chancery, cannot be exercised by this Court, and there can be no such officer of this Court, with the functions claimed for him, under any construction of the positive, or adopted jurisprudence of Georgia. Admitting the history of these officers in chancery, as detailed by *Harrison*, (the authority referred to,) it is *now* for the first time to be considered, whether such an officer, can, under the equity jurisdiction of a Superior Court of Georgia, be appointed *pro tempore*, for the discharge of duties, that are usually imposed upon him, by the chancery jurisdiction of England. Time is not allowed me, nor does the nature of this case, at this period of the discussion require,

that I should detail the powers of a Court of equity in Georgia, as exercised by the Superior Court, with all the incidents of these acknowledged powers. In reference to the Judicial Act of this State, I can only say, that the powers of the Superior Court, cover every foot of ground, that a Court of chancery can occupy in the exercise of its ordinary, or extraordinary authority, as contradistinguished from a Court of common law. The Judicial Act of the State, declares, that "the Superior Courts in the several counties shall exercise the powers of a Court of equity in *all* cases, where a common law remedy is not adequate, to compel parties in *any cause,* to discover on oath all requisite points necessary to the investigation of truth and justice, to discover transactions between co-partners, and co-executors, to compel distribution of intestate's estates and payment of legacies, and to discover fraudulent transactions for benefit of creditors, and the proceedings in all such cases, shall be by bill, *and such other proceedings* as are usual in such cases, until the setting down the cause for trial." Now, this Act clothes the Judge of the Superior Court most completely with the broad and full mantle of a Lord Chancellor, so far, as that habiliment may be compatible, with our political and judicial relations. It gives the ample powers of a Court of chancery, in *all cases* where a common law remedy is not adequate, and as there are many and other cases of that description, I consider the particular enumeration of powers, as inserted, *ex abundanti cautella,* and not at all restrictive of the general and sweeping authority, before designated. And this I believe, and hope, has been the exposition uniformly given. There is no legislative mandate for the co-operation of a Jury in a chancery case—unless it is implied in the term "trial," which *necessarily* conveys the intention of the Legislature, as to the interposition of a Jury. But, shall such an implication, in opposition to the full powers, given to the Superior Court as a Court of equity, and the direction, that the proceedings shall be, as are "usual in such cases," strip the Judge of the Superior Court of

these powers which had been before expressly delegated to his department? It is, then, fairly a matter of doubt, whether a Jury is required in a chancery cause. But it may be said *communis error facit jus*, and the common error has been to give this co-equal power to a special Jury, whose aid is deemed essential to the validity of a final decree. A Jury is an anomaly in a Court of chancery, and in the language of our Judicial Act, is not usual in " such cases." What is usual in " such cases?" Why to refer the facts to a Court of common law for trial—and is there any positive inhibition in the judicial system of Georgia, to interfere with that course of proceeding—thereby preventing the unnatural amalgamation, which now exists of chancery and common law jurisdictions? I think not. But it is not my intention to disturb the belief, which has been impressed upon the public mind, that a special Jury is required by law in an equity case. It is required by a *rule of Court*—and required by this rule of my predecessor, in obedience probably, not to any interpretation of the law of the State, but to the received and adopted practice of the Court. In this minuteness of discussion, my object has been to shew—that *ex debito justitiæ*, the complainants are not entitled to any rights, they have insisted upon in relation to a trial by Jury, and that this Court *might* without infraction of law decree upon the full merits of the case : but another, and principal object has been to shew, that if this Court sustaining a chancery jurisdiction, might dispense with a trial by Jury, where mere naked equitable doctrines were involved, it  followed, it was an irresistible deduction, that it possessed all the incidents of a Court of chancery. If therefore, it should become necessary in aid of the principal powers of this Court, to create a *master*, with the functions usually attached to his office in the country whence we have borrowed our equity system, I do not hesitate in saying, that this power is incidental to the Court, and that such officer, *ad interim* may be appointed. His functions will of course expire with the purposes, or the case requiring the exercise of his functions, because there is no feature in the orga-

[Bolton, et. al. vs. Flournoy.]

nization of this Court, requiring a permanency in his station: and if it did, the Clerk may always be considered as master in chancery.

This brings us to the question, whether this case requires a reference? Mr. *Harris*, has assigned reasons, why there should be a reference, which reasons have been adverted to. Mr. *Law*, does not deny the power of a Chancellor to refer, or that it is the general course, but, contends, that a reference has never been made, but where the title was the only matter in dispute. This is the doctrine, if this Court can appoint a master in chancery, which he had before controverted. He cites late chancery adjudications in support of his position. The title in this case, he says, is not the exclusive matter in dispute. There are facts in the bill variant from the admitted facts in answer, and this is illustrated by the fact, charged in the answer, of six feet of ground, in addition to lots, Nos. 1, 2 and 3. Mr. *Habersham* in reply, afforded the explanation: but I consider the suggestion and explanation as refinements, not interfering with the fact, that stands in the front of this discussion, that *the title* is in *dispute*, and *may* constitute the only pivot upon which the final decree may turn—and that final decree according to the *practice* of this Court, is the result of the conjoint deliberation of the Court, and a special Jury.

A bill is filed for an account,—could it be expected—would it be according to the power given by the judicial system to adopt the usual proceeding in chancery, to submit voluminous and complicated items for the consideration and decree of Judge and Jury? I presume a reference to auditors, would on motion be the inevitable order of the Court: and can there in the nature of things, be any distinction between such reference to auditors, and reference to a master, or a Clerk of this Court, or any other person who may be appointed, to report on the complicated, entangled facts, of a disputed title? The reason operating in favor

of one reference, operates as forcibly in favor of the other. This case may assume an aspect at this period, very different from the aspect assumed on the filing of these bills.' The exhibits do not afford all the evidence, the Court and special Jury would require, the former, in delivering its charges, the latter in returning its decree. The complainant (upon which I have formed, and expressed no opinion, but refer to the argument of his advocates,) *may* at the decree perfect, what was before perhaps a defective title : and this perfection of title may depend upon the persons *in esse*, objects of *Robert Bolton's* benevolence. With these views, I shall direct a reference, but upon terms I hope, which will evince an anxiety to accede to the wishes of defendant for a speedy investigation, at a full hearing, and to consult the equity of the case.

It is *ordered*, that these bills and answers, together with their respective exhibits, be referred to the Clerk of this Court, who is hereby directed to proceed forthwith and without delay, to notify to the complainants and defendant, that he will receive and hear at his office, at a time to be appointed by him, all evidence in aid of, or against the bills and answers, so far as that evidence may relate to the persons named as devisees in the will of *Robert Bolton*, and the issue of such devisees living, appearing to be entitled to the property in dispute ; to report also, with expedition, on such evidence, and on all other matters which may be submitted to him, by complainants and defendant, on the validity, or defectiveness of the title of complainant *John Bolton*, to the property upon the alleged transfer of which, he seeks a specific execution.

And it is further *ordered*, that the complainant have leave to file his general replication, and that this cause be set down for a hearing, during (if practicable) the present term, to abide the further order of this Court, as to its continuance, upon the said report of the Clerk—and that this injunction be continued until the said report shall have been notified to this Court as filed, or until

PART I.—S.

[Bolton, et. al. vs. Flournoy.]

this Court shall have given its further order, on the motion for a dissolution of said injunction.

For complainants—HARRIS & HABERSHAM.   For defendant—BULLOCH, LAW & JACKSON.

---

By the Act of the General Assembly of Georgia, passed 23d December, 1830—the Judges of the Superior Courts of the counties of Chatham, Richmond and Bibb, respectively, are authorized to appoint a master in equity. As that Act leaves the compensation of the master, to be determined " by the Court *and Jury* trying the particular cause," it would *seem* that the doubt entertained by the Court, in the above decision, whether a Jury was indispensably necessary, in a chancery case, under our judicial system, can no longer exist—Vide Acts of 1830. p. 57.—(*Ed.*)